# FIRST NATIONAL BANK OF BARNUM v. ED BLAHA.[1]

September 16, 1932.

No. 28,652.

[1]Reported in 244 N. W. 340.

*Gerald V. Barron,* for appellant.
*Clayton J. Dodge,* for respondent.

DIBELL, J.

Action to recover on a promissory note made by the defendant to the plaintiff. There was a verdict for the defendant. The plaintiff moved in the alternative for judgment notwithstanding the verdict or for a new trial. Its motion for judgment notwithstanding the verdict was granted. The defendant appeals.

■ The action was on a promissory note for $2,000 made by the defendant, Ed Blaha, to the plaintiff, First National Bank of Barnum, on March 10, 1930, due in six months. On March 24, 1927, a note for a like amount, due in six months, was made by the defendant to the plaintiff. The one in suit is the last renewal, at substantially six months' periods, of the earlier one of March 24, 1927.

The defendant claims that the first note was without consideration and was given for the accommodation of the bank. The plaintiff denies this. The affirmative of the issue is upon the defendant. Incidentally, the specific claim of the plaintiff by which it opposes the claim of the defendant is that the note was given for the accommodation of Frank E. Bauer, its cashier, who by this means received $2,000 in cash from the bank. The court charged that the only question was this:

"Was the original note in question, the note of March 24, 1927, made for the accommodation of Bauer? If it was, then the bank is entitled to recover in this case. If it was made for the accommodation of the bank itself, as the defendant claims it was, then the bank is not entitled to recover and the defendant is entitled to a verdict."

On the alternative motion for judgment or a new trial the court concluded that the note as a matter of law was not an accommodation to the bank but to the cashier; and therefore it ordered judgment for the plaintiff notwithstanding the verdict. Its view was

that the case was controlled by Markville State Bank v. Steinbring, 179 Minn. 246, 228 N. W. 757.

Section 29 of the uniform negotiable instruments act, G. S. 1923 (2 Mason, 1927) § 7072, relative to accommodation paper, is as follows:

"An accommodation party is one who has signed the instrument as maker, drawer, acceptor, or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to the holder for value, notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party."

The payee of a note given for his accommodation cannot recover as long as it remains in his hands unnegotiated. See Second Nat. Bank v. Howe, 40 Minn. 390, 42 N. W. 200, 12 A. S. R. 744; Conrad v. Clarke, 106 Minn. 430, 119 N. W. 214, 428; National Citizens Bank v. Bowen, 109 Minn. 473, 124 N. W. 241; Shalleck v. Munzer, 121 Minn. 65, 140 N. W. 111; State Bank v. Pangerl, 139 Minn. 19, 165 N. W. 479. If such a note, that is, an accommodation note to the payee, is negotiated, the purchaser may recover though he knew it was given for the accommodation of the payee. First Nat. Bank v. Malmquist, 158 Minn. 140, 197 N. W. 271.

A part of the evidence bearing on the character of this note and the purpose of its giving is now to be stated; but it may be noted at the beginning that it was not given to take care of a depletion of assets, nor in reorganization of the bank, nor in response to a call by the superintendent of banks, nor to replace charged-off assets, nor by an agreement among the stockholders of the bank to replenish its assets. The bank which brings suit is the same corporation which took the note in 1927. There has been no reorganization, though other money went in to save it and there has been a partial change in ownership and a change in management. The rights of creditors are not involved, nor is there an estoppel. The note was given either for the accommodation of the bank or its cashier; and, as said before, the defendant, to prevail, must prove that it was given as an accommodation for the bank.

■ Frank E. Bauer was the cashier and managing director of the plaintiff bank. He held this position from 1918 until June 26, 1930. The bank was then in trouble, and his connection with it ceased. The capital of the bank was $25,000 in shares of $100 each. Bauer was a large owner of the stock—at one time, he says, a majority owner, though at another he indicates differently. When the crisis came in 1930 it seems conceded that he owned at least 103 shares. Some of it was pledged.

Returning to the original transaction of March 24, 1927, we find the evidence in dispute and subject to different inferences. Bauer called the defendant into the banking rooms and asked him to sign a note of $2,000 to the bank. The defendant was a butcher at Barnum. He speaks sort of stumblingly and perhaps not always understandingly. He was the owner of two shares of stock, and his wife owned a like number. He protested signing the note. There was some talk, so Blaha says, of the bank's being a little short and of its wanting to make use of his name. Bauer said he would guarantee against his having to pay the note. The defendant, upon some pressure, signed. He says, in part, in reference to the conversation with Bauer about the note of March 24, 1927:

"When we got in the room, there was two rooms there; it was the furthest one back, and Mr. Bauer asked me if I would sign a note to the First National Bank of Barnum, and I says, 'I don't like to do that,' I says. 'Well,' he says, 'I will guarantee that you will never have to pay it.' First he said, 'Mr. Spencer—' that is the way he worded it; he said, 'Mr. Thomas Spencer signed one for me, and he has handled all these fire claims and stuff, and he ought to know what he is doing.' I said, 'I don't like to sign this for the First National Bank, because—' 'Well,' he says, 'I will guarantee that you will never have to pay it.' 'Well,' I says, 'if you guarantee me that I will never have to pay it I will sign it.' So that is as far as the conversation went. I signed the note.

\* \* \* \* \* \*

Q. "Now, getting back to the original conversation, Mr. Blaha, between yourself and Mr. Bauer, did he say anything to you as to why the bank needed this money?

A. "Yes, he did.

Q. "What did he say?

A. "Well, he didn't say whether the bank needed the money, but he said they were a little short, the bank was a little short, and they would like to have me help them out a little while. And every time I renewed the note he would say the same thing.

Q. "Every time the note would be renewed?

A. "Yes, he would tell me the same thing.

Q. "That the bank was short?

A. "Yes."

Further he said, in referring to the note of March 10, 1930:

Q. "Where was that note signed?

A. "In the same place.

Q. "At the bank?

A. "Yes, sir.

Q. "And whom did you deal with?

A. "Mr. Bauer.

Q. "He was then the cashier of the plaintiff bank?

A. "Yes, sir.

Q. "How did it come about that you signed this note; who suggested it or who mentioned it?

A. "Mr. Bauer.

Q. "On that day, or before that date?

A. "Well, it was after—it was past due about three days, I think, this last one, something like that.

Q. "And before you signed it did you have any talk with Mr. Bauer?

A. "Yes, I told him that he should try and do something because that note, that I didn't feel like signing them any more, and—

Q. "And did you ask him anything about the condition of the bank?

A. "Yes.

\*  \*  \*  \*  \*  \*

A. "Well, I asked him how the bank was, and he says the bank was in better condition then than it was before."

Blaha received no money. The note was credited as a bill receivable, and Bauer received the equivalent in money. Bauer paid the interest on each renewal. He gave Blaha a receipt as follows:

"$2,000.00                    Barnum        3/24        1927
    Received of Edward Blaha Two Thousand Dollars
Note to apply on purchase of 10 shares of stock of First Natl Bk of Barnum—Consideration 2,850.00.
    No.———                          F. E. BAUER"

Blaha put the so-called receipt in his safe and did not look at it until trouble came in June, 1930. Bauer's explanation relative to the receipt is not satisfactory. When the trouble came he stated that what he had given Blaha was his note. He does not give a very clear explanation why the so-called receipt referred to the purchase of ten shares of stock of the bank for $2,850. Blaha says that there was no talk of a sale. Bauer is not consistent in his testimony, but throughout he intends to say that he was the accommodated party. Questioned on cross-examination, Blaha says:

Q. "Wasn't the conversation with Mr. Bauer something like this: that he said to you that he wanted you to sign that note and put it in the bank as he needed a couple of thousand dollars, and he would give you this receipt so in case he could not pay the note or protect you on it that you could get this stock and would bind him to deliver stock to you that represented money in place of the note?

A. "No.

*    *    *    *    *    *

Q. "Well, now I believe that you testified, Mr. Blaha, then, and that is still your testimony, is it not, that the bank needed help, according to what you understood from Mr. Bauer, and that they were short of or needed some assets to brace them up, and asked you to give your note for the bank's benefit; is that what you mean?

A. "Yes.

Q. "Well, he said—what did he say about the bank's condition there?

A. "Well—

Q. "He said they were short in the bank?

A. "Yes.

Q. "And what did you understand by that that he meant?

A. "I couldn't understand because—actually myself what he did mean.

Q. "Well, you did understand, anyway, that they needed—they were short something, anyway, and they needed a good note to put in there to make them square on their books, or make their assets whole, or something of the kind; is that the idea that you got out of it?

A. "Yes.

Q. "And he also told you that Mr. Thomas Spencer had signed a note for him, Bauer?

A. "That is when I signed the first note, yes.

Q. "Yes. Bauer said that to you when you signed the first note? He said that Tom Spencer had signed up a note for him, Bauer?

A. "He didn't say for who.

Q. "Didn't you testify before lunch that he said that 'Thomas Spencer had signed up one for me,' and Bauer used those words, that 'Tom Spencer had signed up one for me?'

A. "He didn't say 'me.' He said he signed it.

Q. "Didn't you so testify before lunch?

A. "Oh, yes.

Q. "That is right. Didn't he—he did say, 'Tom Spencer signed up—?'

A. "Yes.

Q. " '—one for me?'

A. "Yes.

Q. "He did say that?

A. "Yes.

Q. "He did say 'me' and not 'the bank?'

A. "I don't remember whether he said 'me' or 'the bank.'

Q. "You so testified before lunch, that he said 'me,' did you not?

A. "I might have, yes."

Blaha's testimony does not read easily. Some of it is unfavorable to himself. Bauer's testimony reads more smoothly.

Q. "You remember going over to see Mr. Blaha?

A. "Yes.

Q. "On that day?

A. "Yes.

Q. "And asking him to come over to the bank?

A. "Yes.

Q. "Did you or did you not tell him for what purpose you wished to see him, that is, in the meat market?

A. "I don't remember if I told him over there or not.

Q. "Yes. But when he did come over to the bank in response to your request, you talked with him about signing a note for the bank?

A. "No. I asked him to sign a note for me.

Q. "Did you say 'for me,' or did you just ask him to sign a note?

A. " 'To sign a note for me. I was in need of some money.'

Q. "You did not tell him that the bank needed money?

A. "No, sir.

Q. "What, if anything, did you tell him as to whether or not he would incur any liability on the note?

A. "I didn't tell him there would be no liability on the note.

Q. "Did you tell him there would be liability on the note?

A. "I didn't. I told him that—that I was in need of the money, and asked him to sign a note for me for .$2,000.

Q. "What, if anything, did you tell him about the bank being short?

A. "I didn't tell him anything about the bank being short.

Q. "Didn't tell him anything about the bank's condition?

A. "No, sir.

Q. "And you do not remember whether you did or did not tell him that he would never be liable on the note?

A. "That wasn't—the liability was not discussed.

Q. "Now, Mr. Bauer, what, if anything, of value was the bank giving him for the execution of this note to the First National Bank?

\*    \*    \*    \*    \*    \*

"What, if anything, of value was he receiving because of this transaction, if you know?

A. "He was—I asked him to sign the note for me and that receipt I gave him. I told him at that time if I couldn't pay the note that he could take some bank stock for it later on, if in years to come that I couldn't pay it.

Q. "You state that this receipt that you gave him, do you mean by that, Mr. Bauer, plaintiff's exhibit B? * * * Is that what you mean now?

A. "Yes.

Q. "That was given to him at your instance, wasn't it?

A. "Yes, I gave him this receipt.

Q. "He didn't request anything of that nature; that was your idea, wasn't it?

A. "We talked about the matter, and that is what agreement we came to.

Q. "But, let me ask you this, Mr. Bauer. Was anything said between you and Mr. Blaha about any stock deal at all?

A. "Yes, certainly.

Q. "Who mentioned that first, you or he?

A. "Why, I imagine I mentioned it.

Q. "Did the bank own any treasury stock at that time?

A. "The bank? No, sir.

Q. "As a matter of fact, in June of 1930, or later, you didn't recall ever having given the receipt that you now speak of, marked plaintiff's exhibit B?

A. "I didn't recall it, no, at that time. I didn't, no. That had slipped my mind.

Q. "You had forgotten all about it?

A. "Yes, I did at that time.

Q. "And, as a matter of fact you thought at that time that you had given Mr. Blaha your personal note?

A. "I was under the impression that he had my personal note, yes."

Mr. Bauer is not able to make the transaction relative to the receipt satisfactory. If defendant's note was an accommodation to

him and he did not want his name to appear in the bank, it would be supposed that he would give a note back, as at one time he said he had done, and not a receipt suggesting an obligation upon Blaha to pay an additional $850 for ten shares of stock.

The testimony quoted, although of course far from being complete on either side—far from being satisfactory—suggests the general nature of the claims. The jury might have found that the note was an accommodation either to Bauer or to the bank. Perhaps the evidence makes more clearly for the bank. But the question was of fact for the jury. It is fair to state the view of the trial court expressed upon the granting of the motion for judgment notwithstanding.

"If the facts were as the plaintiff claims them to have been, there would be a clear liability on the part of the defendant. The jury found the facts to be as the defendant claimed them to be. And even under those facts, as the court now views it, the plaintiff is entitled to judgment.

"The defendant's claim was that he executed the note in question at the request of one Bauer, the then cashier of the plaintiff bank, for the purpose of providing the bank with funds which it then needed. The defendant was a stockholder in the bank, as was his wife. It was the defendant's claim that he had an agreement with Bauer that the defendant never would be required to pay the note. Bauer paid the interest upon the note as it matured, and when the note was not paid at maturity the defendant renewed the same several times.

"The facts in this case are so similar to the Markville case that I feel the same rule of law must apply here."

The view of the law stated in paragraph one of the opinion was adopted by the court, but it was of the view that as a matter of law the note was not an accommodation to the bank and so there should be a recovery.

In Markville State Bank v. Steinbring, 179 Minn. 246, 228 N. W. 757, the bank was closed as insolvent and was taken over by the superintendent of banks. A proceeding was instituted for its re-

opening, and an application was made to the superintendent of banks to that end. He required that some $12,000 of poor or worthless paper be charged off and removed from the listed assets and replaced by good paper or securities, and that in addition $10,000 in cash be paid into the bank. The directors and stockholders were solicited to come to the bank's aid. Notes to the amount of $7,750 were obtained and cash to the amount of $14,000, and the bank was then permitted to reopen. The defendant gave the bank a note secured by mortgage for $1,500 to enable the bank to reopen. It was a part of the notes required by the superintendent of banks to be put in the bank as a condition to reopening. The defendant was a director and took part in the proceedings for reorganization. He was made a member of the discount committee and was a member and chairman of the examining committee. He was active as a director and attested three called reports of the superintendent of banks. These reports included his note as an asset. Under these circumstances the trial court held that his note was upon consideration and was not an accommodation and that he could not be heard to deny liability, and its holding was approved by this court. The case before us is different in its facts.

■ The defendant makes another claim, not sharply defined nor well analyzed, that the note was discharged by the events of June, 1930. When Bauer felt the trouble imminent he went to H. C. Hanson of Barnum, who was not connected with the bank, and stated the situation. Hanson with some others undertook to save the bank. They had to some extent the community interest in view and saw the disaster to the people and local business interests if the bank closed. Bauer was willing to give what he had. It was thought that the situation might be saved, and as far as we know it was. As a part of the plan Bauer sold, or put in shape for selling, 103 shares of this stock in the bank on the basis of $200 per share, amounting to $20,600, his home in the village, and his farm and stock and personal property upon it. Hanson advanced fresh money. The money received and the proceeds of the sales went into the bank in general to take care of the liabilities of

Bauer. In the instrument transferring the stock, which was in blank as to the purchasers but which Hanson was authorized to fill in, this was stated:

"The purchase price of said stock after deducting the indebtedness against it, above described, and accrued interest on my said notes, is by said transferees to be paid to the First National Bank of Barnum, to reimburse said Bank for any notes said Bank holds that may prove uncollectible, and to cover any shortages or irregularities that may cause said Bank any loss, no matter by whom such shortages or irregularities were made."

We find no similar statement as to the sale of the personal property and the real property covered by the deed. It is difficult to say just what arrangement was made. If the transaction resulted in the payment of the obligation of Bauer to the bank because of Blaha's note, if there was such an obligation, and there was such obligation only in the event that Blaha's note to the bank was really collateral for Bauer, the claim is that the defendant was discharged. There is no such result as a matter of law. This contention was not presented with a definite analysis. There was nothing to go to the jury upon this phase of the case, and the court properly declined to present it. We are not reviewing an order denying the defendant's motion for a new trial, wherein he could claim error if anything was wrong relative to this specific contention. It is important only as it may be used in the defendant's claim that the verdict should not have been directed, and it is ineffectual for such purpose.

The motion was in the alternative for judgment notwithstanding the verdict or a new trial. The court directed judgment notwithstanding the verdict. Upon the going down of the remittitur the case stands with this order reversed, and the motion for a new trial, which was not determined below, still undetermined and pending.

Order granting judgment notwithstanding reversed.

STONE, J. (dissenting).

In my opinion the order should be affirmed.